## KIRKPATRICK *vs.* STAINER.

An *agent* of a *foreign mercantile house* who induced a merchant here to make a shipment of goods to his principals, to be sold on commission, and *engaged that insurance should be effected* either here or in Europe on the property shipped, WAS HELD not to be *personally* liable for a breach of the agreement to insure; the action, if maintainable, lay only against the principals.

See the dissenting opinion of the CHANCELLOR.

ERROR from the supreme court. This was an action of *assumpsit*, brought by Kirkpatrick against Stainer, for the breach of a contract alleged to have been made by the defendant, to cause insurance to be effected upon a quantity of coffee shipped by the plaintiff at *New-York* for the port of *Trieste*. The vessel in which the coffee was shipped was lost at sea. The plaintiff alleged that no insurance had been effected, and claimed the value of the coffee, with anticipated profits. The cause was heard by *referees*, who made a special report, setting forth the evidence adduced before them. The principal evidence of the agreement rested in two letters: one written by the plaintiff to the defendant on the 27th August, 1830, and the answer thereto under date of the 30th August. The plaintiff's letter commences thus: " Sir—The object of the present, is to confirm the

Kirkpatrick v. Stainer.

verbal agreement made between ourselves respecting 1499 bags of coffee now discharging, of which I showed you invoices and bills of lading. The whole quantity is to be shipped on joint account. For the one half, which *you* take on *your* account, you are to pay in cash—are to advance me five-sixths of the value at the price of 5¾100 per pound: on this advance you are to change me interest," &c. (specifying the terms of the advance.) The plaintiff then proceeds: "The coffee must be shipped as soon as possible for Trieste, to the care of your friends, *Messrs. Dutilh, Ticky & Co.*, with orders for immediate sales and prompt remittances," (directing the mode of remittance.) He then adds: " *You will also take care that insurance be effected, either here or in Europe on the invoice amount, with ten per cent. additional, for probable gains.*" The defendant, in his answer of the 30th August, says: "I consent to the different points respecting the projected shipment to my friends, Messrs. Dutilh, Ticky & Co. in Trieste, of your 1499 bags of coffee. It is understood that the above parcel will be shipped *on joint account between you and Messrs. Dutilh, Ticky & Co.* For *their* half share, *I shall pay* cash here, at the price of 5¾100 short price per pound net; and on *your* half, which you consign for your account to my above Trieste friends, I have no objection to advance five-sixths of the above price, cash, charging the usual interest of six per cent. per annum, from the time my above Trieste friends will remit the funds to cover my drafts on London." Then after adverting to the mode of remittance, he adds: " *The insurance will be covered after your desire, with ten per cent. imaginary gain on the invoice cost, either here or in Europe, as I'll judge more convenient.*" This letter from the defendant is signed, " Ed. Stainer." Sundry letters from Messrs. *Dutilh, Ticky & Co.* to the plaintiff, relative to the non-arrival of the vessel, the insurance of the coffee at *Trieste,* and negotiations with the underwriters there in respect to the payment of the loss ; and also several letters which passed between the plaintiff and the defendant on the same subject were read in evidence. The defendant

also called a witness, who stated that he knew the mercantile house of *Dutilh, Ticky & Co. of Trieste,* and also knew the defendant, who, in August, 1830, was residing in the city of New York as the *agent* of that house, and that it was understood by the house, of which the witness was a member, and he believed by merchants generally, that the defendant was in business *only as agent* of the Trieste house.

The counsel for the defendant insisted before the referees, that the defendant was not *personally* liable to the plaintiff in this cause, inasmuch as in the transaction in question, he acted only *as the agent of Messrs. Dutilh, Ticky & Co.,* and that, with the knowledge of the plaintiff. The referees made a report, setting forth the testimony in the cause, and that the above objection was raised to a recovery; they then state that they find that no insurance was effected by the house of Dutilh, Ticky & Co., but whether or not the defendant is personally liable to the plaintiff for the breach of the agreement to effect such insurance, they say they are altogether ignorant, and pray the advice of the court; and if it shall seem to the court that the defendant is personally liable, then they find that there is due to the plaintiff $832,50; but if, &c. then that there is nothing due to the plaintiff. The supreme court rendered judgment in favor of the defendant. The following opinion was delivered by the Chief Justice:

" *By the Court,* NELSON, Ch. J. Taking the two letters of the 27th and 30th August, 1830, as the evidence of the contract respecting the shipping of the coffee to *Trieste,* and it appears to me there cannot be a doubt that the defendant contracted merely as *agent* for the house of Dutilh, Ticky & Co., and that it must have been so intended and understood by the plaintiff. The defendant had no interest in the adventure, and expressly says to the plaintiff, in his letter recognizing and ratifying the agreement, " It is understood that the above parcel (alluding to the 1499 bags of coffee) will be shipped on joint account between you and

Messrs. Dutilh, Ticky & Co." "For their half hare I shall pay cash here," &c. There is no dispute but that defendant was the agent of the above house in the city of New-York, and duly authorized to make for them the agreement in question. They recognized its validity, and opened immediately a correspondence directly with the plaintiff, which began January, 1831, and continued till October, 1831.

Neither is there any thing in the correspondence of the plaintiff with the defendant in the business, from which to infer he considered him personally holden ; but the contrary. The case presented, is the ordinary one of a private agent clothed with full authority, acting in behalf of his principal ; not only disclosing it, but actually contracting in his name ; for such is the form of the contract to be extracted from the letters of the 27th and 30th August, 1830. There can be no doubt, a person acting as agent of a foreign house, is not responsible, individually, if he discloses his principal, and acts only in his behalf, any more than an agent of a house in this country. There is no such distinction to be found of any authority in the books, nor is there any reason to support it. If an individual desire the personal credit and liability of the agent, he should make known the fact, and all parties will then understand it ; if the agent declines, the vender can refuse to deal with him." The plaintiff sued out a writ of error.

The cause was argued in this court by

*G. Wood*, for the plaintiff.

*J. Prescott Hall*, for the defendant.

*Points for the plaintiff in error* :

I. The contract for insurance, &c. on which this suit is brought, is in writing, and is embraced in the two letters, viz : of the plaintiff of the 27th, and of the defendant of the 30th of August, 1830.

II. On the part of the plaintiff, the language of the contract clearly purports that he looks to the individual per-

sonal responsibility of the defendant; and on the part of the defendant, though *his* letter discloses an agency to a certain extent, he closes the contract by engaging, individually and personally, on his part, and in a way which involves the exercise of his personal discretion in the plaintiff's favor in executing the contract.

III. In written contracts, not under seal, either the agent should execute in the name of the principal, or the body of the agreement should purport that he contracts on behalf of his principal, otherwise the agent makes himself personally responsible. 2 *Kent's Comm.* 631. *last ed. Pentz* v. *Stanton*, 10 *Wendell*, 276. *Paul* v. *Birch*, 2 *Atk.* 622. *Molloy*, *b.* 3, *ch.* 8, *sec.* 9. *Stone* v. *Wood*, 7 *Cowen*, 465. *Buffam* v. *Chadwick*, 4 *Mass. R.* 103. *See* 17 *Wendell*, 40.

IV. In such contracts, though he describes himself as agent of another, or discloses his agency in the instrument, yet if he engages or contracts in his own name, he will be personally liable; more especially in case of the insolvency of the principal, or of his residence abroad, or of any other difficulty or objection in the way of his personal responsibility; and especially so, when the language of the other party to the contract clearly looks to the individual responsibility of the agent. 2 *Liv. on Agency*, 249. *Buller's N. P.* 110. *De Gaillon* v. *L'Aigle.* 1 *Bos. & Pul.* 368. *Cunningham* v. *Soules*, 7 *Wendell*, 106, 108. 15. *East*, 62. 9. *Barn. & Cress.* 78. *Story on Agency.* § 267, 268, 290. *Smith on Mercantile Law*, 78.

V. The defendant does not contract in *the name* of his alleged principals, not does he in the body of his letter purport to contract on their behalf; but his stipulations are personal, and he is in law personally liable to the plaintiff for the breach.

VI. Though Dutilh, Ticky & Co. as principals, may be liable to the plaintiff, by receiving the property, this would not discharge the defendant from, nor be inconsistent with his personal responsibility under his individual engagements. 2 *Kent's Comm.* 631. 10 *Wendell*, 278.

*Points for the defendant in error :*

I. The referees were authorized by the evidence to find that insurance was effected at Trieste, and upon that ground the defendant was entitled to judgment.

II. The defendant is not liable at all in this action. He was the mere *agent* of Dútilh, Ticky & Co., and had no interest in the adventure. This fact is asserted in the *declaration*, and proved not only by the testimony of Mr. Iselin, but by the correspondence spread out upon the record. The plaintiff knew his character, and acted in reference to it. He corresponded directly with Dutilh, Ticky & Co. as *principals*—received letters and accounts from them as such. He *adopted* them as principals, and cannot therefore maintain an action against the agent.

The defendant disclosed his character when he made the contract. He made it for and in behalf of Dutilh, Ticky & Co. They advanced the money in New York ; they took half the adventure ; they were to receive the proceeds of the sales and account for them to the plaintiff. They were bound by the defendant's acts—his authority to bind them being asserted in the declaration, and proved by the evidence ; and where an agent discloses his principal, has authority to bind him by contract, and does bind him, the agent himself is not liable. Here Dutilh, Ticky & Co. were bound by the defendant's contract ; this they admit by their letters and accounts. The action commenced against the agent will lie against the principals, and they alone are responsible. This should be so ; the justice of the case requires it ; for the defendant had no interest in the affair, except as an agent for others. The proof should be strong which is to bind him to discharge the obligations of another, and the law requires it. *Hay* v. *Tucker, Super. Ct. of N. Y.* 1835. 2 *Kent's Comm.* 2d ed. 630. *Bourne* v. *Maers,* 2 *Taunt.* 273. *Randell* v. *Van Vechten,* 19 *Johns. R.* 60. *Say* v. *Colbourn,* 11 *Mass. R.* 97. *Northampton Bank* v. *Pepoon, id.* 288. *New-Eng. Ins. Co.* v. *Dewolf,* 8 *Pick. R.* 56. *Rathbone* v. *Budlong,* 15 *Johns. R.* 1. *Owens* v. *Gould,* 2 *Esp. R.* 567. *Macbeath* v. *Haldimand,* 1 *T. R.* 172. *Unwin* v. *Wolseley, id.* 674. *Talbot* v. *Sea-*

*man,* 1 *Chranch,* 3. *Mott.* v. *Hicks,* 1 *Cowen,* 573. *Fox,* v. *Draket,* 8 *id.* 191.   *Gram* v. *Seton,* 1 *Hall's R.* 262.

After advisement, the following opinions were delivered :

By the CHANCELLOR.   There is no question as to the general rule of law, where an agent or factor, who is duly authorised to contract for his principal discloses the fact of his agency, and the name of the person for whom he is acting, that he is not personally liable if he makes the con_ tract in such form as to be binding upon his principal, un less it satisfactorily appear that he also intended to bind himself personally.   The general rule on this subject is not questioned by the counsel for the plaintiff in error : but he insists, in the *first* place, that the fact that Dutilh, Ticky & Co. were foreigners, residing at Trieste, in the Austrian German territories, takes the case out of the general rule, and renders the agent personally liable ; and *secondly,* that the form of the contract was not such as to make it binding upon the defendant's foreign correspondents—or, at least, that it appears from the contract itself, that it was the understanding of the parties that the defendant was to be personally liable for the performance thereof.   These two questions I shall therefore proceed to consider : for we have nothing to do with the question of fact, which has been decided by the referees, whether an insurance ever was effected at Trieste on the property in question.

. If the referees were wrong in supposing that the Italian certificates were not evidence of the fact, or that they were mere fictions, as to which I express no opinion, the supreme court had the power to send the case back to the referees to review the decision, in the nature of a new trial ; but it could not authorize even that court to give a judgment for the defendant in opposition to the express finding of the referees ; and this court is not authorized to grant a new trial, on the ground that the verdict or report is against evidence, although we may be of the opinion that the jury or the referees have come to a wrong conclusion upon a matter of fact—as the court upon a writ of error only reviews

Kirkpatrick v. Stainer.

the decision of the court below upon questions of law, even upon a report of referees. The question before us is merely as to the personal liability of the defendant for the $832,50 loss which the plaintiff sustained in consequence of the non-fulfillment of the contract to insure his half of the cargo and the 10 per cent profits, beyond the amount received by him through the house of Brown, Brothers & Co.

The chief justice was evidently under a mistake in supposing that there was no distinction to be found in any books of authority between the liability of an agent who contracts for a foreign house, and one who contracts for a person residing in the same country where the contract is made, and where such agent is domiciled ; and he certainly would not, notwithstanding the multiplicity of cases which are brought before him for examination and decision, have fallen into that error or have overlooked the authorities on that point, if the cause had been as fully argued in the court below as it has been here. The first case I have been able to find on this subject, is that of *Gonzales* v. *Sladen,* referred to by Mr. Justice Buller, as decided at Guildhall in Trinity term, in the first year of Queen Anne, from sergeant Salkeld's manuscript. *Bull. N. P.* 130. I refer to this case particularly as it was long before the revolution, and therefore possesses the same binding authority here as it did in the courts of England at the time of our separation from the mother country. The principle is also found in a book of high authority from the fact that it had the sanction of two distinguished English judges, and had passed to a third edition in 1775; the edition of judge Buller, 1772, being but a republication of the original anonymous work of Mr. Justice Bathurst, afterwards Lord Chancellor Apsley, in 1767. *See Bridg. Legal Bibliog.* 230. *Preface to Selw. N. P.* 7. *Lond. ed. and Clark's Bibliog. Legum,* 292. The law as there stated, and I presume in the language of Judge Bathurst himself as this case of *Gonzales* v. *Sladen* is cited in support of it in the first edition by Judge Buller in 1772, is that where a factor to one *beyond sea* buys or sells goods for the person to whom he is a factor, an action will lie against or for him in his own name, for the credit will be

presumed to be given to him in the first case; and in the last the promise will be presumed to be made to him; and the rather so as it is so much for the benefit of trade. In the case of *DeGaillon* v. *L'Aigle*, 1 *Bos. & Pul.* 368, where the court upon demurrer had decided that the wife of an absentee was liable to be sued as a feme sole, and the sheriff upon the execution of the writ of inquiry against her had permitted the jury to find nominal damages only, upon proof that the defendant acted as the agent of her husband who resided abroad, in the purchase of the goods, the court of common pleas made a rule absolute to set aside the inquisition, and Eyre, C. J. added, "I am not aware that I have ever concurred in any decision in which it has been held, that if a person describing himself as an agent for another residing abroad, enters into a contract here, he is not personally liable on that contract." In the case of *Thomson* v. *Davenport*, 9 *Barn. & Cress.* 87, which came before the court of king's bench in England in 1829, the same principle is distinctly stated and recognized as settled law. Lord Tenterden, C. J. in delivering his opinion in that case in reference to the liability of an agent who had purchased goods for another, says, "There may be another case; and that is where a British merchant is buying goods for a foreigner. According to the universal understanding of merchants and of all persons in trade, the credit is then given to the British buyer and not to the foreigner." In a recent case in Scotland, the commercial law of which is substantially the same as that of England, and of this country, where the defendant insisted that the goods had been sold to him as the agent of a foreign house, Lord Pitmilly said, that independent of the defendants' failure to prove the facts alleged, he as agent ordering goods for a person abroad necessarily rendered himself personally liable for the price. *Burgess* v. *Buck & Co.* 7 *Shaw & Dunl. Sess. Ca.* 824. Mr. *Bell*, the learned professor of law in the university of Edinburgh, in his illustrations of the principles of the law of Scotland from adjudged cases, refers to this case, and to the case of *DeGaillon* v. *L'Aigle*, decided by the court of common pleas in England, as settling the principle that an agent ordering

Kirkpatrick v. Stainer.

goods for a person abroad is personally liable, although he describes himself as agent. 1 *Bell's Illust.* 153. This principle of charging the agent personally where he contracts for the benefit of a foreigner, although he would not have been liable if the contract had been made for a constituent residing in the same country, is distinctly recognized by all the writers on the law of agency both in this country and in England to whose works I have had access. *Smith* says, " It will seem also to be a rule that whenever the agent is an English, and the principal a foreign, merchant, the seller will be considered as having given credit to the Englishman, and that he and not the foreigner is liable." *Smith's Merc. Law,* 2 *Lond. ed.* 104. And he considers the same rule as applicable to other cases where there is no responsible employer against whom an available action can be brought, except in the special case of a public officer contracting in his public capacity for the government. *Id.* 120. *Paley,* after stating that the agent is held to be personally liable where there is no responsible person who can be sued as principal, or where the principal is unknown, says, " Factors resident abroad are for the same reason generally liable in their own persons, for the credit is presumed to be given to them." *Paley on Agency, Exeter ed.* 294. *Livermore,* our countryman, in his learned work on the same subject, says, " There is a sound distinction between the case of a principal residing in the country where the contract is made, and that of a principal residing abroad. In the latter case the factor may be sued because he is on the spot, and his principal being abroad cannot be reached." He refers to the two cases of *Gonzales v. Sladen,* and *De Gaillon v. L'Aigle,* as sustaining that distinction. 2 *Liver. on Agency,* 249. In addition to these authorities we have the opinion of Mr. Justice *Story,* in his recent valuable treatise on the law of agency, to which we were referred on the argument ; and, as I have before had occasion to say, his opinion is of itself of very high authority upon a question of commercial law. Indeed I think I may say, without injustice to any one, that his judicial opinion upon a question of this kind would be entitled to more weight than that of

any single judge who at the present time occupies a seat upon the bench either in this country or in Great Britain. After stating the reasons why the agent is held personally liable where he discloses the fact that he is purchasing as an agent, but without disclosing the name of his principal at the time of the purchase, this learned jurist says : " It is partly upon this ground, and partly upon the ground of general convenience and the usage of trade, that the general rule obtains that agents or factors acting for merchants resident in a foreign country, are held personally liable upon all contracts made by them for their employers; and this without any distinction whether they describe themselves in the contract as agents or not. In such cases the ordinary presumption not only is that credit is given to the agents, but that it is exclusively given to them, to the exoneration of their employers. Still, however, this presumption is liable to be rebutted by proofs that credit was given to both principal and agent or to the principal only." *Story on Agency*, 265, § 268.

Upon a careful examination of the law on this subject, I have therefore arrived at the conclusion that there is a well settled distinction between the personal liability of an agent who contracts for the benefit of a domestic principal, and one who contracts for a principal who is domiciled in a foreign country. I do not think that by our commercial usage it is applicable to the case of a principal who is domiciled in another state of the union; as the interests of trade do not seem to require it. Besides, it does not appear to have been applied in England to the case of a principal residing in Scotland; although in the case of *Thomson v. Davenport*, before referred to, Lord Tenterden supposed it might have been a proper subject of inquiry for the jury, whether there was not a usage of trade at Liverpool to give the credit to the agent, where the principal resided in Scotland. So far as the law is settled on the subject, however, it only applies to a principal domiciled in a foreign country ; or, in the language of the common law, " beyond the seas." Dutilh, Ticky & Co. residing upon the borders of the Adriatic, the present case is clearly within the rule as settled. In reference to the manuscript case of *Hay*

v. *Tucker and others,* decided in the superior court of the city of New-York, it may be proper to say, that if the distinction referred to by Judge Story, exists, that case was wrongly decided ; as the agents in that case say " we have stipulated in behalf of Robert Butler," &c.

I see no difficulty in the form of the contract, in this case, to bind the principals and to relieve the agent from personal liability, if they had not been domiciled abroad. It is well settled, that in a commercial contract, not under seal, no particular form of words is necessary to bind the principal. Where the principal is known to the other party, and the contract is formally drawn up and signed by the parties, it should probably appear in some part of the contract that the agent is acting for some person other than himself; as he will be personally liable if he expressly contracts in his own name, without any reference to his character as agent, either in his signature or in the body of the contract, although he was duly authorized to contract on behalf of his principal. The true rule upon the subject, I apprehend to be this, that where it appears from a contract made by the agent for a domestic principal, that he was such agent, the presumption is that he meant to bind his principal only ; unless there is something in the contract from which it can be legally inferred that he meant to bind himself solely, or both himself and his principal, for the performance of the contract. On the contrary, if the contract is made in behalf of his foreign correspondent, who is domiciled abroad, the legal presumption is, that the agent meant to hold himself personally liable for the performance of the contract, unless from the terms of the contract it appears that he meant to contract upon the credit of his foreign principal exclusively, for the agent in such a case may be personally liable on the contract, although the principal is also bound.

In the case under consideration the contract is not drawn up in due form and signed by both parties. It is drawn up in the form of a letter and an answer thereto, which is a very common mode of making contracts between merchants ; and as is frequently the case in making such bargains, where each party uses his own language to express

his meaning, their letters, if taken separately, might bear a different construction from what both would, if taken together. The only proper way in such a case, in giving a legal construction to the contract, is to take both letters together, without placing any particular reliance on either of them separately. It appears from the letters in this case that a verbal contract had been made between the parties, and that the object of this correspondence was to put it in writing. The plaintiff's letter is directed to Mr. E. Stainer, (the defendant,) without describing him as agent. And no one from the reading of that letter, would hesitate a moment in saying it was the intention of the plaintiff to give credit to Stainer alone. He says: "The whole quantity is to be shipped on joint account. For the one half which you take on your account, you are to pay me cash; are to advance me five-sixths of the value at the price of five and three-quarter cents per pound, (that is on the other half.) On this you are to charge me interest at the rate of six per cent. per annum from the time the funds are remitted from Trieste to meet the drafts on London for the same; also, the customary charge for the negotiation of drafts here; say one per cent. and the brokerage in London. The coffee must be shipped as soon as possible for Trieste, to the care of your friends, Messrs. Dutilh, Ticky & Co., with orders for immediate sales and prompt remittances," &c. And in relation to the insurance, which is the only subject of controversy here, he says: "You will also take care that insurance be effected, either here or in Europe, on the invoice amount, with ten per cent. additional, for probable gains." In the answer of the defendant, written three days after, and signed with his own name "Ed. Stainer" only, he says: "In reply to your esteemed lines of the 27th, I consent to the different points respecting the projected shipment to *my friends*, Messrs. Dutilh, Ticky & Co., in Trieste, of your 1499 bags of Rio coffee," &c. And although he, in the next paragraph of the letter, shows that it is to be shipped on the joint account of the plaintiff and Dutilh, Ticky & Co., he speaks in the first person throughout in reference to the payment of the money for

their half of the advance of the five-sixths of the plaintiff's share, without the least intimation that he does not mean to hold himself responsible for the fulfilment of the contract. And in relation to the insurance, he says: "The insurance will be covered after your desire, with ten per cent. imaginary gain on the invoice cost, either here or in Europe, *as I shall judge most convenient.*" Taking both these letters together, therefore, and applying to this agreement the principle, that the credit is presumed to be given to the agent who contracts for the benefit of a foreign merchant, instead of the merchant himself, unless there is something in the terms of the agreement to show that was not the understanding of the parties, I think the defendant in error was personally liable for the fulfilment of his contract with the plaintiff.

The receiving of the amount which was placed to the plaintiff's credit with Brown, Brother & Co. was not an election by the plaintiff to relinquish his claim upon the defendant, and to look to the persons by whom that remittance was made, as it was a part of the defendant's original agreement that the money belonging to the plaintiff should be thus remitted to London for his use. And I have not been able to find any thing in the facts, as found by the referees, from which it could be inferred that the plaintiff had elected to look to Dutilh, Ticky & Co. as his debtors, or to relinquish his claim upon the party with whom the original contract was made.

For these reasons, I think the judgment of the supreme court should be reversed, and a judgment entered for the plaintiff, upon the report, for the balance as found due by the referees.

By Senator VERPLANCK. I concur with the supreme court in their understanding of this negotiation. Taking together the two letters of the parties on which the bargain was concluded, the defendant appears to have acted merely as the known agent of the house at Trieste, for and on account of whom he had made the advances, and to whom the goods were consigned. He contracted for the foreign

house and in their name, but made no undertaking for himself. This evidence of the correspondence is supported and confirmed by collateral proof of the general belief and understanding among New-York merchants, that the defendant was in business only as the agent of the foreign house. In such dealings, it is settled that the principals are alone responsible, unless there be some special circumstance to fix the responsibility upon the agent personally. I do not think that there is any such circumstance in this case; although the fact of the defendant being an agent of a *house abroad*, added to the authority of Judge Story, the reasons he assigns, and the unqualified language he uses as to the liabilities of factors purchasing for foreign merchants, occasioned at first some doubt in my mind. In his late valuable work on agency, Judge Story says, "On the ground of general convenience and the usage of trade, the general rule obtains, that agents or factors, acting for merchants resident in foreign countries, are held personally liable upon all contracts made by them for their employers; and this, without any distinction whether they describe themselves in the contract as agents or not. In such cases it is presumed not only that credit is given to such agents, but that it is exclusively given to them to the exoneration of their employers. Still the presumption is liable to be rebutted by proof, that the credit was given to both principal and agent or to the principal alone." *Story on Agency*, § 268. *See also the reasons assigned in the preceding section, and in § 290.* To the same effect a respectable recent English elementary writer speaks thus: "It seems that when a British agent contracts for a foreign principal, the agent is liable." *Smith on Mercantile Law, p. 78.* Now, if this be also the doctrine of our own commercial law, it may well be doubted whether the language of the correspondence, though showing Stainer "to describe himself in the contract as an agent," is yet sufficient, even with the collateral evidence, (conclusive as the whole would be in the case of agent for a domestic principal,) to rebut such a positive legal presumption, and to prove that credit was given *only* to the Trieste house, so as to authorize the

Kirkpatrick v. Stainer.

court to pronounce on the facts submitted to them by the referees, "that the defendant was not personally liable upon the agreement." But upon examining the several cases cited in support of this rule, I am satisfied that Judge Story has stated the doctrine in too strong and unqualified terms, as if this presumption were a universal inference of law, applicable every where. I think, on the contrary, that this is a presumption founded altogether upon usage and the particular course of trade, and arises only, when and where that usage is known or proved to exist; of course, then, that it is not an unvarying legal presumption, to be applied to any contract, made any where, by a factor or agent representing a person or commercial house in some foreign country.

Doubtless there may be such a local usage or understanding controlling all contracts of this sort amongst us, as there is certainly in *London*, and probably all over England. But unless it be so firmly settled and generally known that it may be assumed without proof, like any other mercantile mode of business of common and public notoriety, such a usage must be shown before the consequent presumption of the agent's liability and the principal's exoneration can arise. I can find no judicial authority for considering this as a rule of general commercial law, independent of a particular course of trade, unless it be a very cautiously expressed *dictum* of Chief Justice Eyre, giving his own individual opinion on the point, after the case in which it had been raised had been decided by the court upon a very different ground. He then added: "I am not aware that I have ever concurred in any decision in which it has been held that if a person describing himself as an agent for another residing abroad, enters into a contract here, he is not personally liable on that contract." *DeGaillon* v. *L'Aigle*, 1 *Bos. & Pull.* 368. In the other cited cases the rule is placed on the ground I have stated. Thus, in *Patterson* v. *Gundasequi*, 15 *East*, 70, Judge Bailey says; " There may be *a particular course of dealing* with respect to trade, in favor of a foreign principal, that he shall not be liable in cases where a home principal would be liable—that would be a ques-

Kirkpatrick v. Stainer.

tion for the jury." So again, some years after, in *Thomson* v. *Davenport*, 9 *Barn. & Cress.* 78, Lord Tenderden argues thus: "Where a British merchant is buying for a foreigner, according to the usual understanding of all persons in trade, the credit is given to the British buyer, not to the foreigner. In this case the buyers lived at Dumfries, and a question might have been raised for the *consideration of the jury*, whether in consequence of their living at Dumfries, it may not have been understood among all persons at Liverpool, that the plaintiff had given credit to the agent alone, and not to persons living in a country not amenable to the jurisdiction of our courts." Now, if this presumption rested not upon the known approved course of trade in the place, but upon a general principle of mercantile law, it is manifest that there would be no propriety in leaving it to the jury to consider whether it extended to principals living in Scotland or not; or what was "the understanding amongst all persons living at Liverpool." Above all, Lord Tenterden decidedly recognizes "the usual understanding of all persons in trade," as in effect, the reason and authority for the presumption of credit being given to the British buyer, and not to the foreigner. The language of Judge Bayley, in the same case, is equally marked: "There may be a course of trade by which the seller will be confined to the agent who is buying. *Generally speaking*, that is the case where an agent here buys for a house abroad. There may also have been evidence of a course of trade applicable to an agent acting for a firm resident in Scotland." Here as late as 1829, this able and very experienced judge speaks of the usage on which the presumption is founded as a "course of trade which *may* exist." He considers that course of trade alone as "confining the seller to the agent." He does not say that this course of trade holds universally with this effect: but "that generally speaking, it is the case:" and he suggests that there may have been evidence before the jury of "such a course of trade applicable to dealings with Scotland." The language and reasoning of this case admit, I think, no other inference than that both these eminent judges (of the highest authority in all com-

mercial law,) considered the legal presumption of liability of
the agent of a foreign principal, as resting entirely upon the
actual custom and understanding of trade ; that it does not
apply universally as a matter of course, but arises only upon
known and admitted usage, or upon the positive proof of some
particular course of trade.

To these judicial opinions I add the authority of a late
English legal writer, frequently quoted with high approba-
tion by Judge Story. *Lloyd*, in his notes on *Paley on
Agency*, thus mentions the rule, evidently with some doubt,
as to its extent, and referring it wholly to the usage of trade :
" *It seems*, that by the usage of trade, if the principal be a
foreigner, the credit is considered as having been given to the
English broker, and that he only, and not the foreign buyer,
will be liable. That question is, however, for a jury." I
therefore infer that the presumption is not one raised by
legal reason, to be taken notice of, as of course, and applied
to such contracts wherever made, but one of special usage,
or of local understanding, entering into and thus controlling
all contracts unless excluded by express stipulation.    If,
however, the course of trade and of credit is now so fixed
and so universally recognized in *England*, as to have be-
come a rule of presumptive evidence — a legal inference
from known public usage, to be applied without special
proof of its existence ; still I cannot regard it as being ne-
cessarily a part of our own commercial law.    It forms no
part of the old common law of England, nor is it deduced
from any settled doctrine or principle of that law, otherwise
than as a rule of presumptive evidence of intention, grow-
ing out of positive and unvarying local commercial usage.
The oldest trace of it before our revolution, which I have
been able to find, is in the first edition of Buller's Nisi Prius,
the work of a then young though learned lawyer, who there
refers only to an older manuscript nisi prius case, tried in
London, where the evidence of such a course of trade might
probably have gone to the jury, or where it may have been
admitted as a matter of notorious custom in London.    I
find no judicial notice of it in the reports until 1797, when
Chief Justice Eyre expressed his opinion on the point, as

having never concurred in any previous decisions contradictory to this rule; and that such contradictory decisions had been made, I think his language intimates. The other cases are later, and from all of them I infer that this presumption, (if at length it has become a strict legal presumption, of which I am not satisfied,) has grown up in modern times from the peculiar character of the foreign trade of England. If this presumption be now the law of the English courts, without requiring evidence of usage in every case, it is founded upon admitted general custom and understanding; but it is now law deduced from the doctrines of the old common law, or resting upon reasons of natural equity or universal public policy, extrinsic to the local usage of trade, and applicable alike at *London* and in *New-York*. If such were the case, I should respect the decision of the able and learned men who adorn the English courts; because their decisions carry with them the authority of learning and wisdom, arguing from principles and usages common to their country and our own. If the judges of England have established this as the law of their tribunals, within the last few years, they have done so for reasons and upon former repeated evidence peculiar to the course of trade in England, and not of necessity applicable elsewhere. They have found a usage or course of business so universal, so familiar, as to form a part of every contract on foreign account without being expressed in words. On this, a legal presumption may have been at length raised, as of course. But if here, we have no such universal unvarying usage, nor any evidence in any particular case of a similar special course of trade, it follows that the legal presumption must fall to the ground.

Such a mercantile usage may naturally grow up here, either in the general course of trade, or in any particular branch of distant commerce; and, whenever it becomes so known, or wherever it is proved to exist, it should certainly raise the same presumption with us as in England. But it would be of the greatest public inconvenience to assume a general rule applicable to and exonerating every principal residing in another state, and so, (according to Lord Ten-

terden's idea,) " not amenable to the jurisdiction of our courts," or even to principals not resident within the United States. In the present state of business in our commercial metropolis, the rule is in fact contradictory to the understanding on which a vast number of such contracts are made. Besides, I cannot but think that as a mere rule of commercial policy, it would be hazardous to establish any general strong presumption that credit on sales or consignments is not given to well known foreign houses, or to merchants of Boston or New-Orleans, but merely to the transient and often irresponsible agent, temporarily resident in this state. This would exonerate the foreign trader not only here, but, by the application of the doctrine of the *lex loci contractus*, it might also do so in the courts of his own domicil ; unless it could be expressly shewn that the foreign principal was alone trusted, which it would commonly be difficult to do, in the face of a strong legal presumption to the contrary. Such a usage and the consequent presumption, might grow up in New-York with great public convenience as to trade with China or South America, and yet be absurd and injurious in respect to London or Liverpool. It might even become general in the city of New-York, as to foreign trade, and yet be wholly inappropriate to the business of Buffalo of Oswego with other states of the Canadas. Until commercial convenience gives evidence to the contrary by express, universal and notorious usage, or unless where such usage can be specially proved to exist in some particular branch of business, it is safer and wiser to adhere to the general and ordinary law of agency, keeping the known principal responsible where the agent discloses his name and acts avowedly in his behalf ; and leaving it to the discretion of the American trader to obtain the additional security of the factor or agent, or to give credit to him only, when he judges that to be the most for his own interest.

No usage or course of business analogous to that prevalent in England, being notorious or well established by former evidence as existing here, and no proof having been offered to the referees of any special or local usage, or com-

mon understanding, charging the agent alone, and not his foreign principal, for purchases or contracts made avowedly for such known principal, the case must be governed by the general law as to the contracts of a private agent, clothed with full authority and acting openly in behalf of his principal.

The judgment of the supreme court should, therefore, be affirmed.

On the question being put, *Shall this judgment be reversed?* the members of the court divided as follows:

*In the affirmative:* The CHANCELLOR and *Senators* HULL, H. A. LIVINGSTON, PAIGE, SPRAKER, VAN DYCK—6.

*In the negative:* The PRESIDENT of the Senate, and *Senators* BEARDSLEY, FOX, FURMAN, HAWKINS, HUNT, HUNTINGTON, JONES, MAYNARD, MOSELEY, NICHOLAS, PECK, POWERS, SKINNER, STERLING, VERPLANCK, WAGER, WORKS —18.

Whereupon the judgment of the supreme court was AFFIRMED.