JOSEPH  E.  HERNANDEZ  and  WILLIAM  C.  ROBINSON, Respondents, *v.* BROOKDALE MILLS, INC., Appellant.

First Department, December 17, 1920.

Principal and agent — action for breach of contract of sale — when agent of foreign principal not personally liable on contract of sale — knowledge of purchaser that representative of agent has been accustomed to act for foreign principal — when representative of agent not authorized to bind agent personally — erroneous exclusion of evidence tending to show contract was made for principal — when agent assumes personal liability — contract signed by agent personally — parol evidence tending to show contract was made for principal — corrupt agreement to pay agent for placing contracts.

Where the plaintiffs, knowing that a certain company was the selling agent for a foreign principal, and in the belief that such agency still continued, negotiated through a representative of said agent the purchase of certain goods from the foreign principal, and after learning that said selling agency had terminated and that the representative with whom it had negotiated had become the representative of the defendant, accepted the confirmation of said purchase in writing, which was signed with the defendant's name, the plaintiffs cannot hold the defendant for a breach of said contract of sale on the theory that it bound itself by the contract and was not acting as agent for the foreign principal.

Under the circumstances, where the plaintiffs had notice that the representative of the former agent had entered the employment of the defendant, they had no right to infer that he had authority to make a contract of sale for the defendant as seller rather than for the foreign principal.

It was error for the court to exclude evidence tending to show that the defendant was in fact the selling agent of the foreign principal, even if the evidence offered were not the best evidence.

While it is competent for an agent acting for a disclosed principal to bind himself personally by a contract made in behalf of his principal, if the other party exacts it or he volunteers and intends so to do, it is to be presumed that he intends only to bind the principal.

If the contract be ambiguous on the point with respect to whether it is the individual contract of the agent or a contract made for his principal, although signed by the agent individually, parol evidence is admissible to show whose contract it was intended to be.

*It seems,* that where a contract of sale is apparently complete on its face and is signed by the agent of a known principal individually, and there is noth-

ing to indicate that it was made for his principal or that he did not intend to bind himself thereby, parol evidence to show that it was intended to be made in behalf of the principal is not admissible to relieve the agent from personal liability although it is admissible to hold the principal.

But where the principal is known to the person dealing with the agent and it is mutually understood that a contract not under seal is negotiated for the principal, the agent is not liable thereon, although he signs with his own name.

Where the agent of a disclosed principal either verbally or in writing not under seal negotiates a contract for and in the name of a disclosed principal, and after the terms of the contract have been informally agreed upon confirms it formally in express terms in his individual name, recourse may be had to the negotiations to show that the contract was the contract of the principal.

Evidence examined, and *held*, that the contracts of sale were incomplete in themselves so that parol evidence was admissible, not to contradict or impeach them, but to show for whom they were made.

In an action against the agent personally, it was error for the court to exclude evidence of a corrupt agreement made between its representative and the plaintiffs, the purchasers, whereby it was agreed that the representative should participate in the profits made by the plaintiffs on all contracts placed with them or procured for them by him.

APPEAL by the defendant, Brookdale Mills, Inc., from a judgment of the Supreme Court in favor of the plaintiffs, entered in the office of the clerk of the county of New York on the 20th day of April, 1920, upon the verdict of a jury, and also from an order entered in said clerk's office on the 21st day of April, 1920, denying defendant's motion to set aside the verdict and for a new trial made upon the minutes.

*Alton B. Parker* of counsel [*Elbridge L. Adams* with him on the brief], for the appellant.

*Joseph M. Hartfield* of counsel [*Vermont Hatch* with him on the brief], *White & Case*, attorneys, for the respondents.

LAUGHLIN, J.:

The plaintiffs, who are copartners engaged in the city of New York in the business of exporting and importing, brought this action to recover damages for the failure of the defendant, a domestic corporation, to perform two contracts for the sale

to the plaintiffs of sugar bags to be shipped from Calcutta, India, to Havana, Cuba. They recovered a verdict for $523,600, representing the difference between the contract price and the market price of the sugar bags. Each contract consists of a letter addressed to the plaintiffs on the letter-head of the defendant and signed in its name by Alexander J. Munro, who was the manager of the East India department of its business, accepted in writing at the foot thereof by the plaintiffs. One of the contracts is for 2,000,000 sugar bags and it bears date the 16th of February, 1917, and the other is for 200,000 bags and bears date the twenty-sixth of that month.

The defendant pleaded and gave and offered evidence upon and from which it claimed on the trial and contends on the appeal (1) that the contracts were made in behalf of a disclosed principal and should be construed as having been made for the principal and not as binding the defendant; (2) that if the contracts are to be construed as having been made in behalf of the defendant, then Munro was not authorized to bind it, and the plaintiffs were aware of the limitation of his authority; and (3) that the contracts were void for the reason that the plaintiffs bribed Munro to influence him in not properly representing his principal, by offering and agreeing to give him a percentage of their profits on any business they received through contracts placed with them by him, which those involved herein concededly are.

Some of the evidence on which these claims are predicated was received but for the most part it was excluded. That excluded, however, consists principally of documentary evidence which was marked for identification and is in the record. The trial court ruled broadly that the contracts bound the defendant individually; that Munro was authorized to make them in its behalf, and that evidence of the alleged bribery of Munro related to a transaction in December, 1916, before he entered the employ of the defendant and at a time when when he was representing the predecessor of the defendant as agents of Shaw & Co. of Calcutta, who were engaged, among other things, in selling sugar bags. The evidence received and offered shows that the plaintiffs had similar business relations with Wells & Co., who were commission

agents for Shaw & Co. of Calcutta, commencing in the month of May, 1916, and were not aware that Wells & Co. had ceased to be the selling agents for Shaw & Co. until they received by mail the first of these two contracts on or about its date, and that the plaintiff Hernandez, who was then absent from the New York office, on returning thereto, found this proposed contract on his desk awaiting his action thereon, and that inferring therefrom that Munro was then with the defendant, he took the proposed contract to the defendant's place of business where he saw and had an interview with Munro. and signed the acceptance of the plaintiffs on the contract and thereupon negotiated the other contract with Munro, who dictated it, and after it was written out, signed and delivered it to Hernandez, who also signed it. It thus appears that the two contracts, whatever may be their effect, were made at the same time. The trial court ruled that the only construction to which these contracts are open is that the defendant contracted individually for the sale of the bags to the plaintiffs although no negotiations by or in behalf of defendant for such contracts were shown and the court excluded evidence which would have shown conclusively that the negotiations resulting in these contracts were conducted between the plaintiffs and Munro, who the plaintiffs then supposed was representing Wells & Co. as agents of Shaw & Co. of Calcutta. It will be necessary, therefore, in reviewing the decision of the trial court with respect to the construction of the contracts, to consider the terms of the contracts in full. The first contract, known as Exhibit 1, is as follows:

" Brookdale Mills

" 299 Broadway

" Cable Address — Brodamil, New York.

"*February 16th,* 1917.

" Hernandez, Robinson & Co.,

        " Baltimore, Md.:

" Gentlemen.— We beg to confirm sale made to you of 2,000,000 Standard Size Plain Weave Cuban Sugar Bags, 2″ Blue Stripe, same as the bags shipped to you last year under contract with W. Wells & Co.

" Shipments: To be effected from Calcutta during the month of June or earlier.

" PRICES: 19–1/2c each C.I.F. Main Cuban Ports, including War. Shaw & Company to draw at four (4) months sight against your confirmed New York Bankers' credit issued in their favor.          Yours very truly,

                         " BROOKDALE MILLS,
"Accepted                         ALEX. J. MUNRO.
  " HERNANDEZ, ROBINSON & Co.,
          ''per J. E. HERNANDEZ — Part."

The second contract, known as Exhibit 2, is as follows:

                    " BROOKDALE MILLS
                      " 299 Broadway
          " Cable-Address — Brodamil, New York.
                              " *February 26th*, 1917.

" HERNANDEZ, ROBINSON & Co.,
        " 29 Broadway, N. Y. City:

" DEAR SIRS.— We beg to confirm sale to you of the following: 200,000 Heavy ' C ' Cuban Sugar Bags at 19.50c each cif Main Cuban Ports, including war risk.

" SPECIFICATION: 48x29 $\frac{8x9}{8x8}$ weighing 2 1-2# in proportion to a bag 40x28 2″ Blue Stripe.

" SHIPMENT: June from Calcutta.

" TERMS: Four (4) months New York confirmed Bankers' Letter of Credit opened through an approved bank.

" Kindly sign one copy of this and return same to us at your earliest convenience.

                    " Yours very truly,
                         " BROOKDALE MILLS,
" M. D.                         ALEX. J. MUNRO.
  " Accepted by
    " HERNANDEZ, ROBINSON & Co.,
        "per J. E. HERNANDEZ, Part."

It will be observed that neither of the contracts purports to be the original contract, but each of them expressly provides that it is a *confirmation* by the defendant of a sale theretofore made to the plaintiffs. Exhibit 1 indicates quite plainly that the goods were to be shipped, not by the defendant, but from Calcutta by Shaw & Co.— that plaintiffs so understood is

shown by their letter to defendant May 12, 1917 — and were to be consigned to a Cuban port and that defendant was to receive no consideration from plaintiffs, for the entire consideration was to be paid to Shaw & Co. and payment of it was to be secured by a New York bankers' credit to be issued in favor of Shaw & Co. It is indefinite and incomplete with respect to specifications and refers to a former contract therefor and that was a contract made for Shaw & Co., but this omission was supplied by letter shortly thereafter. There is no evidence of any refusal on the part of the plaintiffs to purchase of Shaw & Co. direct or that they required defendant to become personally liable. Although Exhibit 2 is not so full with respect to who was to deliver and be paid, since they were both made at the same time it is evident that they were intended in those respects to be the same. There is no question but that the plaintiffs understood that the defendant in making the contracts was acting as agent for Shaw & Co. On June 14, 1917, plaintiffs cabled Shaw & Co. referring to these contracts as having been made by the plaintiffs with Shaw & Co. through their then agent, the defendant; and on the fifteenth of June plaintiffs, not having been informed concerning the date when the bankers' credit for the purchase price of these goods would be required, wrote the defendant referring to the two contracts as having been made with them by the defendant as the agent of Shaw & Co. although in that letter they also stated that they remained ready to carry out the contracts and expected the defendant and its principal to do the same and that they intended to hold the " seller " for their damages in the event of the failure of the " seller " to perform. The court excluded a notice, which was marked Exhibit U for identification, sent out to the trade by the defendant and shown to have been mailed to the plaintiffs on February 2, 1917, and which the evidence would have warranted a finding, was received and read by the plaintiff Hernandez on the morning of February twenty-sixth before either contract was signed by him for the plaintiffs. That notice was an announcement by the defendant of the appointment of Munro as manager of the East Indian department of the defendant for the importation of burlap, jute and other products from India and the Far East, " and to represent

Messrs. Shaw & Company, Calcutta," and called attention to the fact that Munro had been active in the burlap business. The court also excluded a letter sent by Munro to the plaintiffs under date of February 14, 1917, which was marked Exhibit P for identification, likewise received by the plaintiffs before they signed either contract. That letter informed the plaintiffs that Munro had become associated with the defendant and that under an arrangement made with Messrs W. Wells & Co., Inc., their future business would be conducted under the name of Brookdale Mills, and that thereafter as long as Munro remained connected with the Brookdale Mills it would represent Shaw & Co. of Calcutta. The court also excluded the evidence of the negotiations, part of which was evidenced by telegrams, cablegrams and letters, which resulted in these two contracts and which showed that the plaintiffs supposed that they were negotiating with Wells & Co., Inc., who had theretofore represented Shaw & Co. and with whom they had made five similar contracts under dates of May 31, June 5 and 9, August 24, and September 22, 1916, under which the goods were invoiced by Shaw & Co. to the plaintiffs at Havana and the full purchase price had been paid by the plaintiff to Shaw & Co. through like bankers' credits and which contracts the plaintiffs had treated as made in behalf of Shaw & Co. and had been regarded by the practical construction of the parties, as those in question were to the extent hereinbefore stated, as having been made with Shaw & Co. Evidence of the practical construction of the parties and as to who was to deliver and to receive pay for the goods is very material in construing contracts. (*Anderson* v. *English*, 105 App. Div. 400; *Fox* v. *Coggeshall*, 95 id. 410; *Farnsworth* v. *Clark*, 44 Barb. 601; *Bradt* v. *Krank*, 164 N. Y. 515.) The trial court not only excluded the five similar contracts negotiated between the plaintiffs and Shaw & Co. in the year 1916 by Munro, acting for Wells & Co., Inc., the agent for Shaw & Co., and written evidence clearly showing that they were recognized by the plaintiffs as the contracts of Shaw & Co. only and were performed as such by them, but also evidence of negotiations subsequent thereto conducted with the plaintiffs by Munro representing Wells & Co., Inc., as agent for Shaw & Co. for other contracts, which negotiations culminated

in said Exhibit 1; and also excluded evidence that Munro had no negotiations with the plaintiffs in the name or in behalf of the defendant prior to February 16, 1917, when he so mailed to them said Exhibit 1, the receipt of which was the first information the plaintiffs had that Munro had severed his connections with Wells & Co., Inc., and was representing the defendant. It appears by documentary evidence which was excluded that the negotiations which resulted in said Exhibit 1 were instituted by a cablegram to the plaintiff Hernandez, who was then in Havana, on the 26th of January, 1917, offering them sugar bags at specified prices for immediate shipment from New York and for shipment from Calcutta in June and signed " Wells." To that Hernandez replied by letter and cablegram on February 10, 1917. The letter referred to a cablegram from Hernandez·on February fourth and to a letter from Munro on February sixth and to a cablegram from Munro on February ninth referring to a bid made by the plaintiffs which are not in the record, and stated that plaintiffs were making contracts in Havana based on the quotations contained in the cablegram from " Wells " on January twenty-sixth. On February thirteenth Munro in his own name cabled Hernandez that he had that day offered to the plaintiffs' Baltimore office 2,000,000 sugar bags for June shipment from Calcutta to Cuban ports at nineteen and one-half cents each and his telegram to the plaintiffs at Baltimore was to the same effect but did not specify the quantity; and in each he requested an immediate reply if the plaintiffs intended to accept. On the same date plaintiffs from Baltimore wired Wells & Co., Inc., as follows: " Your wire not delivered, we accept offer given over phone, two million plain weave bags, same as furnished this year, nineteen one-half cents cif, Main Cuban ports including war risk, June shipment, wire acceptance." On February fourteenth Hernandez cabled Wells & Co., Inc., as follows: " As per your cable thirteenth accepted Baltimore, advise me having closed with you." Munro, who evidently controlled the agency of Shaw & Co. in New York for his brother, was a member of the firm of Shaw & Co., but the court did not permit the defendant to make full proof on the subject, severed his connection with Wells & Co., Inc., who ceased to do

business in this line, and entered the employ of the defendant on the 2d of February, 1917, but it is to be inferred from the fact that they continued to address letters, cablegrams and telegrams to Wells & Co., Inc., and Hernandez's absence, that plaintiffs were not aware of this change, and thus it appears that they supposed that they had closed the contract, which Exhibit 1 was intended to confirm, through Wells & Co., Inc. It is to be inferred that Munro prepared and mailed to the plaintiffs at their Baltimore office said Exhibit 1 as a confirmation of the contract which he had thus negotiated with them when they supposed he was representing Wells & Co., Inc. The plaintiff Robinson testified that the receipt by mail of Exhibit 1 at the Baltimore office was the first notice he had that Munro was connected with the defendant, and that he thereupon obtained from a financial rating agency a report concerning the defendant and then marked Exhibit 1 with his secret mark indicating to his partner Hernandez that he approved it and forwarded it to the New York office. As already stated, it was there received by Hernandez on the 26th of February, 1917, on his return from Cuba, and taken by him to the office of the defendant and signed in behalf of the plaintiffs and delivered to Munro. Munro, in his letter to the plaintiffs on the fourteenth of February announcing his connection with the defendant, referred the plaintiffs to the Mechanics and Metals National Bank as to the responsibility of the defendant. Neither this fact nor the fact that the plaintiff Robinson obtained a report with respect to the financial responsibility of the defendant has any material bearing on the question as to whose contracts these were, for if the plaintiffs were dealing with the defendant as agent for Shaw & Co. they would be interested in knowing the responsibility of the defendant with which they were contracting, on the assumption, as represented by the defendant, that it was the authorized agent of Shaw & Co. The court also excluded a letter written by Munro in the name of Wells & Co., Inc., to the plaintiffs on the 5th of December, 1916, and their answer thereto addressed to Wells & Co., Inc., two days later. That correspondence shows an agreement between the plaintiffs and Wells & Co., Inc., by which the plaintiffs agreed to make all of their purchases of Cuban sugar bags through

Wells & Co., Inc., and the latter agreed that it would not solicit trade with Cuba directly or indirectly with certain exceptions concerning houses having representatives in New York city, and that it would give the plaintiffs its "best offices" and secure for the plaintiffs the "best possible price" on sugar bags for shipment to Cuba, and was to transact business on the usual one per cent commission allowed them by their "Calcutta friends," and was to pay all cable charges between New York and Calcutta; and it was agreed that all shipments of sugar bags and all orders placed with it by the plaintiffs were to be accompanied by a four months' confirmed London bankers' credit in favor of Shaw & Co. and that any dispute as to the quality of the bags would be settled by arbitration in New York and be binding "on both Calcutta and yourselves and on your buyers in Cuba." The plaintiffs accepted the terms unqualifiedly as proposed by Wells & Co., Inc., and they promised to place orders only with Wells & Co., Inc., and on the terms and conditions suggested, and stated that they expected that Wells & Co., Inc., would at all times offer them advantageous prices and that they would "enjoy all the advantages as if dealing direct with purveyors in Calcutta, India." In the light of that formal agreement and of the fact that the plaintiffs supposed that they were negotiating these contracts through Wells & Co., Inc., until they received the formal contract, Exhibit 1, it is quite plain that the plaintiffs had no reason to suppose that Wells & Co., Inc., was negotiating the contract in its own behalf. The most favorable view to the plaintiffs that can be taken of the evidence is that the defendant having succeeded to the agency theretofore held by Wells & Co., Inc., confirmed the contract that had been negotiated by the plaintiffs with Wells & Co., Inc., and on that theory the defendant cannot be held to have made the contracts individually if Wells & Co., Inc., had it made the contract, could not have been held individually. It is perfectly plain, I think, that Wells & Co., Inc., if it had signed Exhibits 1 and 2 could not have been held liable for the performance thereof, for the general agreement evidenced by the letters of December fifth and seventh would, in that event, necessarily be considered in construing the contracts. If Munro had subscribed the name of Wells & Co., Inc., that

would merely have constituted a confirmation in writing of the contract it had negotiated for Shaw & Co., its principal. By Munro's subscribing the defendant's name to the confirmatory communications, the contracts, which the plaintiffs had negotiated with Shaw & Co. through Wells & Co., Inc., as agent became confirmed in writing by the *new agent* of Shaw & Co. If the plaintiffs had then supposed that the contracts bound the defendant individually, surely they were put upon their inquiry with respect to whether Munro had authority to make such contracts without any negotiations for his employer. (See *Cullinan* v. *Bowker*, 180 N. Y. 93.) If all of the evidence to which I have referred had been received, as I think it should have been, it could not be held that Exhibits 1 and 2, construed in the light of the rule that it is to be presumed that the agent of a known and disclosed principal does not, in contracting for his principal, intend to charge himself, bound the defendant individually. Moreover, evidence received and evidence improperly excluded showed or would have shown and have warranted a finding that before either of these contracts was made, plaintiffs had received the notice from the defendant that with respect to business with Shaw & Co., Munro was only authorized to represent the defendant in making contracts as agent for Shaw & Co. It will be observed that the only information the plaintiffs had, when they received and signed Exhibit 1, and signed Exhibit 2, concerning Munro's connection with the defendant, was contained in the notice Munro had sent them under date of February fourteenth, and the notice that had been mailed to them by the defendant on February second; and upon no construction of either were they warranted in inferring that he had authority to make a contract for the sale of these goods by the defendant. The learned counsel for the plaintiff, evidently realizing this, deemed it necessary to present further evidence of Munro's authority and for that purpose, offered in evidence part only of the contract of employment made by the defendant with Munro. The part of the contract thus offered in evidence showed that the defendant employed Munro as manager of its Calcutta department; but excluded provisions of the contract prohibited Munro from making any purchase or sale without the consent of the defendant con-

firmed in writing, and obligated him to keep the defendant informed concerning the transactions and business of the department of which he was given charge, and to advise with its officers concerning " large commitments." The court also excluded evidence duly offered by the defendant to show that it did not authorize and was not aware of the making of these contracts by Munro. Under a general ruling that it was immaterial the court excluded proof to show that defendant was the selling agent of Shaw & Co. on a commission basis and authorized by its principals to make the contracts. That ruling cannot now be sustained on the ground that the evidence offered was not the best and was, therefore, incompetent. Had it not been for the ruling the defendant might have overcome the other objections to the evidence.

It is, of course, competent for an agent acting for a disclosed principal to bind himself personally by a contract made in behalf of his principal if the other party exacts it or he volunteers and intends so to do, but it is to be presumed that he intends only to bind the principal, and, therefore, unless the contract clearly shows that it was intended to be the personal contract of the agent, he is not bound thereby individually and the party with whom he negotiates it may look only to the principal for performance, but the agent, if not authorized by his principal, becomes liable for all damages sustained by the party so contracting in reliance upon his authority. (*Commercial Bank* v. *Waters,* 45 App. Div. 444; affd., 167 N. Y. 583; *Ferris* v. *Kilmer,* 48 id. 300; *Hall* v. *Lauderdale,* 46 id. 70; *Whitney* v. *Wyman,* 101 U. S. 396; *Bonynge* v. *Field,* 81 N. Y. 159; *Jones* v. *Gould,* 123 App. Div. 239; 130 id. 451; 200 N. Y. 18; *Kirkpatrick* v. *Stainer,* 22 Wend. 244; *Royal Indemnity Co.* v. *Corn,* 162 N. Y. Supp. 659; *Davis* v. *Lynch,* 31 Misc. Rep. 724; *Kessel* v. *Austin Mining Co.,* 144 Fed. Rep. 859; *McCurdy* v. *Rogers,* 21 Wis. 197; *Hewitt* v. *Wheeler,* 22 Conn. 557; *Worthington* v. *Cowles,* 112 Mass. 30.) If the contract be ambiguous on the point with respect to whether it is the individual contract of the agent or a contract made for his principal although signed by the agent individually, parol evidence is admissible to show whose contract it was intended to be. (*Anderson* v. *English, supra; Union Trust Co. of New York* v. *Whiton,* 97 N. Y. 172; *Morrill* v. *C. T. Segar Mfg. Co.,*

32 Hun, 543; *Hartzell* v. *Crumb,* 90 Mo. 630; *Green* v. *Kopke,* 18 C. B. Rep. 549. See, also, *Crandall* v. *Rollins,* 83 App. Div. 618; *Underwood* v. *Greenwich Ins. Co.,* 161 N. Y. 413, 422; *Thomas* v. *Scutt,* 127 id. 138.) Where, therefore, a contract in writing is apparently complete on its face and is for the purchase or sale of goods and the agent although of a known and disclosed principal signs the contract individually and there is nothing in the contract to indicate that it was made for his principal or that he did not intend to bind himself thereby — parol evidence contradicting the written contract and showing that it was intended and understood to be made in behalf of the principal is not admissible to relieve the agent from personal liability although it would be admissible to hold the principal. (*Gordon Malting Co.* v. *Bartels Brewing Co.,* 206 N. Y. 528; *Meyer* v. *Redmond,* 205 id. 478; *Coleman* v. *First National Bank of Elmira,* 53 id. 388.) There is seldom any difficulty in applying the law where the contract is made by an agent known to be acting in that capacity who does not disclose the name of his principal, for in such case the party dealing with the agent must necessarily rely on his credit since he knows nothing concerning the responsibility of the undisclosed principal (*Meyer* v. *Redmond, supra; Good* v. *Rumsey,* 50 App. Div. 280), but when the principal is known to the person dealing with the agent and it is understood by both parties that the contract is negotiated for the principal, the courts should not close their eyes to the manner in which such contracts are constantly negotiated and by the application of an arbitrary rule hold that a contract intended and understood to be that of the principal personally binds the agent, who had no intention of pledging his personal credit, and binds the principal as well, so that the party dealing with him may look to whichever of them he finds to be the more responsible financially. It will not do, therefore, to hold that a contract negotiated by an agent for a known and disclosed principal becomes the contract of the agent if in negotiating it verbally or by writing not under seal, he signs his own name without taking the precaution to tell the person to whom he is writing that he is acting for his principal which is already fully understood. (See *Commercial Bank* v. *Waters, supra.*) I take it, therefore, that if an offer of a contract be

made to a disclosed principal by tendering it through his agent, and the agent accepts by saying or writing, " I accept your offer," and signing his individual name, the agent in so accepting would be deemed to be acting for his principal to whom the contract was offered and it would be deemed the contract of the principal only. So, too, I think, where an agent of a disclosed principal either verbally or in writing not under seal, negotiates a contract for and in the name of a disclosed principal and after the terms of the contract have been informally agreed upon, formally in express terms confirms it in his individual name, recourse could be had to the negotiations to show that it was the contract of the principal. That, I think, is this case, for assuming that Munro was authorized by the defendant to make these communications called the contracts, they confirm a sale already made but do not specify the defendant as the seller. If, as we must assume, the defendant was authorized by Shaw & Co. to negotiate the contracts, it could for its principals confirm the contract by these writings and thereupon the contracts which had been negotiated for the principals became binding upon them by being thus reduced to writing and signed by their authorized agent. The contracts thus confirmed by the defendant were incomplete in themselves and do not clearly show that it was intended that they were to be the individual contracts of the defendant, and, therefore, they fall within the exception to the general rule and admit of parol evidence, not to contradict or impeach them, but to show for whom they were made.

I am of opinion that three of the points made by the appellants are good and that each of them requires a reversal. *First*, in the light of the facts shown and of the evidence duly offered by the defendant and excluded, these contracts should not be construed as imposing on the defendant an individual liability. There is no charge or evidence that the defendant was not authorized to make the contracts in behalf of Shaw & Co., and evidence offered tending to show that it possessed such authority was excluded. *Second*, if the contracts are to be construed as imposing an individual liability on the defendant and other evidence is not admissible to aid in their construction, then I think Munro was not authorized to make them and that the plaintiffs were sufficiently aware of the

limitations of his authority to represent the defendant, for the notice of the defendant sent out to the trade, and which the jury would have been authorized in finding was received and read by one of the plaintiffs before either contract was signed, plainly showed that with respect to goods to be obtained through Shaw & Co., Munro was only authorized to negotiate contracts in behalf of the defendant for Shaw & Co. *Third*, I am also of opinion that the court erred in excluding evidence of a corrupt agreement made in December, 1916, between Munro and the plaintiffs by which it was agreed that Munro should participate to a large extent in the profits made by the plaintiffs on all contracts placed with them or procured for them by him. That agreement, as defendant pleaded and offered to prove it, was not confined to the business transacted by Munro for Wells & Co., Inc. It was sufficiently broad to apply to these contracts whether Munro negotiated them for the defendant or for its principal, Shaw & Co.; and, if made, it constituted a corrupt agreement to influence the action of the agent Munro and the jury would have been justified in finding that it influenced his action with respect to these contracts, for there is evidence that the market price of those goods at the time was several cents per bag more than these contracts required the plaintiffs to pay. If defendant had been permitted to show these facts the contracts would have been void as against public policy and unenforcible. (*Sirkin* v. *Fourteenth Street Store,* 124 App. Div. 384; *Merchant's Line* v. *B. & O. R. R. Co.,* 222 N. Y. 344.)

It follows that the judgment and order should be reversed and a new trial granted, with costs to appellant to abide the event.

CLARKE, P. J., PAGE and MERRELL, JJ., concur; SMITH, J., concurs in result.

Judgment and order reversed and new trial ordered, with costs to appellant to abide event.